UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1) SNIDERS JEAN-JACQUES,<br>(2) LORNE JOHNSON,<br>(3) TANYA PIERRE, and<br>(4) ASHLEY SPIKE,<br><br>Defendants | Criminal No.  26cr10031<br><br>Violation:<br><br>Count One: Conspiracy to Commit Wire Fraud<br>(18 U.S.C. § 1349)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461(c)) |

## INDICTMENT

At all times relevant to this Indictment:

### General Allegations

1.    Defendant SNIDERS JEAN-JACQUES lived in Florida.

2.    Defendant LORNE JOHNSON lived in Massachusetts.

3.    JEAN-JACQUES and JOHNSON operated On the Go Tax Services ("OTG"), a tax preparation business with offices in Massachusetts and Florida.

4.    Defendant TANYA PIERRE lived in Florida and worked as JEAN-JACQUES's assistant.

5.    Defendant ASHLEY SPIKE lived in Florida.

6.    Co-conspirator 1 ("CC-1") lived in Florida.

7.    Borrowers 1, 4 and 5 lived in Massachusetts.

8.    Borrowers 2 and 3 lived in Florida.

9.    The United States Small Business Administration ("SBA") was an agency of the executive branch of the United States government. The mission of the SBA was to maintain and

1

strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans, guaranteed by the government, through banks, credit unions, and other lenders.

The Paycheck Protection Program

10.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic. Among other things, the CARES Act provided funding for forgivable loans to small businesses for job retention and certain other expenses through the Paycheck Protection Program ("PPP").

11.     To obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. In the PPP loan application for self-employed individuals, the applicant was required to state, among other things, their gross income for 2019 or 2020, and to submit their IRS Form 1040 Schedule C, which reports income or loss from a sole proprietorship, with the application. Lenders used this information to calculate the amount of money the small business was eligible to receive under the PPP.

12.     Participating lenders received and processed businesses' PPP loan applications. If a PPP loan application was approved, the lender would fund the PPP loan using its own monies, which were guaranteed by the SBA.

13.     The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on certain permissible expenses–namely payroll costs,

2

interest on mortgages, rent, and utilities–within a designated period of time and used at least a minimum amount of the PPP loan proceeds toward payroll expenses.

## Overview of the Conspiracy and Scheme to Defraud

14.     Between at least in or about March 2021 and in or about December 2022, in the District of Massachusetts, the Southern District of Florida, and elsewhere, JEAN-JACQUES, JOHNSON, PIERRE, SPIKE, and CC-1 conspired with each other and others known and unknown to the Grand Jury to obtain PPP loans for dozens of borrowers by submitting fraudulent PPP loan applications to PPP lenders. The fraudulent applications falsely stated the borrowers' gross income and included fake Schedule C forms to substantiate the claimed income.

## Object and Purposes of the Conspiracy

15.     The object of the conspiracy was to commit wire fraud by submitting fraudulent applications for PPP funds to participating PPP lenders. The purposes of the conspiracy were to make money and to conceal the submission of the fraudulent applications from PPP lenders, the SBA, and law enforcement authorities.

## Manner and Means of the Conspiracy and Scheme to Defraud

16.     Among the manner and means by which JEAN-JACQUES, JOHNSON, PIERRE, SPIKE, CC-1, and others known and unknown to the Grand Jury carried out the wire fraud conspiracy were the following:

a.     Recruiting potential borrowers to apply for PPP loans regardless of whether the borrowers had qualifying businesses;

b.     Traveling between Florida and Boston to meet with prospective fraudulent PPP loan applicants;

3

        c.      Applying for Employer Identification Numbers with the Internal Revenue Service and filing state business registrations to make the borrowers' purported businesses appear legitimate;

        d.      Making false representations on PPP applications regarding the borrowers' purported gross income for the purpose of securing PPP loans to which the borrowers were not entitled;

        e.      Establishing tax preparation software accounts in the names of JOHNSON, PIERRE, SPIKE, and CC-1, so that co-conspirators could create fake Schedule C forms listing inflated or fabricated gross income for the borrowers' purported businesses;

        f.      Using the tax preparation software to create fake Schedule C forms;

        g.      Causing borrowers to sign and certify the fraudulent PPP applications electronically with PPP lenders;

        h.      Causing PPP lenders to fund the fraudulent PPP loans;

        i.      Charging borrowers as much as 30 percent of the PPP loan proceeds as a fee; and

        j.      Communicating with each other about the fraudulent PPP applications.

17.      In this fashion, JEAN-JACQUES, JOHNSON, PIERRE, SPIKE, CC-1, and others fraudulently obtained PPP loans totaling millions of dollars for themselves and other borrowers.

4

Acts in Furtherance of the Conspiracy and Scheme to Defraud

18.     On various dates between at least in or about March 2021 and in or about December 2022, in the District of Massachusetts, the Southern District of Florida, and elsewhere, JEAN-JACQUES, JOHNSON, PIERRE, SPIKE, CC-1, and others known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the conspiracy and scheme to defraud:

*Borrower 1*

        a.     On or about March 3, 2021, Borrower 1 met JEAN-JACQUES at OTG's Boston office, where JEAN-JACQUES demanded a $1,000 upfront cash payment from Borrower 1 for the preparation and submission of Borrower 1's PPP application.

        b.     On or about March 3, 2021, JEAN-JACQUES prepared and caused to be submitted a PPP application and Schedule C on behalf of Borrower 1 that falsely claimed Borrower 1 had gross income of $123,005 in tax year 2019.

        c.     After Borrower 1 received a PPP loan of $20,833 on or about March 13, 2021, and a second PPP loan of $20,833 on or about April 9, 2021, JEAN-JACQUES demanded Borrower 1 pay him an additional $12,000.

*CC-1*

        d.     On or about March 8, 2021, JEAN-JACQUES, in exchange for a portion of the loan proceeds, prepared a fraudulent PPP application and Schedule C on behalf of CC-1 that falsely claimed CC-1's business had gross income of $153,400.

5

e.    On or about March 9, 2021, CC-1 messaged JEAN-JACQUES via WhatsApp asking, in substance, how much CC-1 would be paid for recruiting potential borrowers and preparing fake documents for their PPP applications.

f.    On or about March 9, 2021, JEAN-JACQUES messaged in response that CC-1 would receive 10 percent of the loan proceeds and JEAN-JACQUES would take 20 percent of the proceeds.

g.    On or about March 10, 2021, JEAN-JACQUES instructed CC-1 by WhatsApp to "call Spike to help you with the new people"—that is, additional fraudulent PPP borrowers.

h.    On or about March 11, 2021, CC-1 went to SPIKE's apartment, where SPIKE taught CC-1 how to fill out fraudulent PPP applications.

i.    On or about March 23, 2021, PIERRE gave CC-1 a list of occupations and associated income and expense ranges to use when creating fake Schedule C forms for fraudulent PPP applications.

j.    On or about March 24, 2021, PIERRE taught CC-1 how to create fake Schedule C forms to submit with PPP applications.

k.    On or about March 25, 2021, JEAN-JACQUES assigned CC-1 and PIERRE a group of individuals from Georgia for whom CC-1 and PIERRE were to prepare fraudulent PPP applications.

l.    Between on or about March 25, 2021, and on or about March 26, 2021, CC-1 sent several WhatsApp messages to JEAN-JACQUES, who was in Massachusetts, with

questions about PPP loan forgiveness, signing the fraudulent PPP applications, and other PPP-related topics, which JEAN-JACQUES answered via WhatsApp.

*Borrowers 2 and 3*

       m.      On or about March 29, 2021, JEAN-JACQUES emailed CC-1 a fake Schedule C for Borrower 2 for CC-1 to use as a model when preparing fake Schedule C forms for other PPP applications.

       n.      On or about March 30, 2021, SPIKE emailed CC-1 a Schedule C for Borrower 3, which SPIKE had created when she was teaching CC-1 how to prepare a Schedule C.

       o.      On or about April 28, 2021, JEAN-JACQUES sent JOHNSON a WhatsApp message with a link to information about PPP loans.

       p.      On or about May 4, 2021, CC-1 sent JEAN-JACQUES a WhatsApp message asking for the address of JEAN-JACQUES's Boston office because CC-1 was going to send a potential borrower there.

*Borrowers 4 and 5*

       q.      On or about March 20, 2021, Borrower 4 visited JOHNSON at OTG's Boston office, where JOHNSON prepared a fraudulent PPP application on behalf of Borrower 4. The application falsely claimed that Borrower 4 had a business that generated more than $153,000 in gross income in 2019.

       r.      On or about May 24, 2021, JOHNSON sent JEAN-JACQUES a video via WhatsApp of JOHNSON attempting to upload bank statements supporting a fraudulent PPP application for Borrower 5 and the error message JOHNSON received when doing so.

s.      On or about June 17, 2021, JEAN-JACQUES directed CC-1 to tell a fraudulent PPP loan applicant to send a payment of $2,500 to JOHNSON.

COUNT ONE
Conspiracy to Commit Wire Fraud
(18 U.S.C. § 1349)

The Grand Jury charges:

19.     The Grand Jury re-alleges and incorporates by reference Paragraphs 1 through 18(s) of this Indictment.

20.     Between at least in or about March 2021 and in or about December 2022, in the District of Massachusetts, the Southern District of Florida, and elsewhere, the defendants,

> (1) SNIDERS JEAN-JACQUES,
> (2) LORNE JOHNSON,
> (3) TANYA PIERRE, and
> (4) ASHLEY SPIKE,

conspired with each other and with others known and unknown to the Grand Jury to commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, to transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit, fraudulent PPP applications and electronic communications regarding the fraudulent applications, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United State Code, Section 1349.

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

21.     Upon conviction of the offense in violation Title 18, United States Code, Section 1349, set forth in Count One, the defendants,

> (1) SNIDERS JEAN-JACQUES,
> (2) LORNE JOHNSON,
> (3) TANYA PIERRE, and
> (4) ASHLEY SPIKE,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

22.     If any of the property described in Paragraph 21, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants–

> a.  cannot be located upon the exercise of due diligence;
>
> b.  has been transferred or sold to, or deposited with, a third party;
>
> c.  has been placed beyond the jurisdiction of the Court;
>
> d.  has been substantially diminished in value; or
>
> e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 21 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

10

A TRUE BILL

FOREPERSON

*Kristen A. Kearney*
KRISTEN A. KEARNEY
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: February 5, 2026
Returned into the District Court by the Grand Jurors and filed.

/s/ Leonardo T. Vieira, 2:15pm

DEPUTY CLERK

11